# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN  DIVISION

| | | |
|---|---|---|
| **TWANA BOND JONES,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | **CV-11-BE-3852-S** |
| **BELLSOUTH COMMUNICATIONS, LLC,** | ] | |
| | ] | |
| **Defendant** | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

This Title VII case, alleging retaliation and a hostile work environment based on race,  is

before the court on "Defendant's Motion for Summary Judgment and Incorporated Memorandum

of Law." (Doc. 29).  The *pro se* Plaintiff filed a response (doc. 32) as well as a sur-reply (doc. 36)

to the Defendant's reply (doc. 33).  For the reasons stated in this Memorandum Opinion, because

no genuine issue of material fact exists and because the Defendant is entitled to judgment as a

matter of law, the court will GRANT the motion in its entirety.

## I.  FACTS

The following facts are based on the *evidence* submitted, viewed in the light most

favorable to the non-movant, here the Plaintiff, Twana Bond Jones.  In her response and sur-

reply, Jones does not provide additional undisputed facts or additional disputed facts, with

evidentiary cites, nor does she attach further evidence to those briefs.  She does attempt to

dispute many of the facts listed in the brief of Defendant BellSouth Communications, LLC., and

1

where her disputes are based on citations to evidence that does indeed contradict BellSouth's

facts, the court accepts those disputes.  However, where Jones fails to cite any evidence for her

dispute and merely provides argument in her brief that is not under oath and that is not supported

by cited evidence, the court does not consider those facts properly disputed as set forth in the

Order Setting Summary Judgment Briefing Schedule and the attached Appendix II.  (Doc. 31).


Jones, who is African American, began working for Defendant Bellsouth

Communications, LLC as a sales associate in 2006.  Her duties included answering inbound calls

from customers and consulting with customers to recommend and sell a variety of

telecommunications products and/or services. (Doc. 30-3, at 2).  Jones had a series of immediate

supervisors called sales coaches, most of which are African American, and they reported to Jason

Pollard, the Central Sales Manager, who is white.

*Bellsouth's Method of Performance Measuring*

Bellsouth sets monthly and yearly sales objectives for sales associates, and sales

associates' supervisors monitor achievement on a daily, monthly, and year-to-date basis.  A sales

associate's performance is considered satisfactory if she receives a score of *at least* 100 totaling

sub-scores in four categories of critical performance: (1) average billed income; (2) retention

units sold; (3) revenue per call; and (4) customer satisfaction.  The four categories do not have

the same weight, but their combined total should reach a *minimum* score of 100 to be

satisfactory.  The scores are tracked on a scorecard.

*Bellsouth's Progressive Discipline Policy*

Bellsouth has a progressive discipline policy that applies to the sales associate position

and has four steps: step one is counseling; step two is a warning; step three is suspension (or a letter in lieu of suspension); and step four is termination.   A collective bargaining agreement ("CBA") governs the terms and conditions of Jones's employment.  Under the CBA, a counseling entry will be removed after 6 months, a warning will be removed after 24 months, and a suspension or letter in lieu of suspension will be removed after 36 months, but in each case the removal only occurs if no disciplinary action happens in the interim period.

*Jones's Performance 2007-January 2009*

At the beginning of 2007, Jones's performance scores were satisfactory; however, in April of 2007, her score dropped to 96.32 and remained below 100 for the rest of the year, resulting in her yearly score as less-than-satisfactory.  In accordance with the progressive discipline policy, Jones received counseling entries on May[1] 3, 2007 and  June 11, 2007, and received a warning for unsatisfactory performance on July 17, 2007.

In 2008, Jones's performance scores were unsatisfactory for every month except April, and her yearly score was 94.32, also unsatisfactory.   Tangela Morton, an African American manager and sales coach, discussed with Jones her less than satisfactory performance for the 2008 year and reported that discussion in a document dated February 12, 2009.

In mid-January of 2009, Jones signed a copy of the "Birmingham Operational Guidelines."  Included in the guidelines was the following statement: "The appraisal performance measurement plan combines critical performance areas into a composite score.  100% is the

---

[1] The date of entry on this document shows the month as either a five (May) or an eight (August).  Because the text under the entry characterizes it as a counseling, not a warning, and under the CBA counselings occur before warnings, the court assumes that the counseling documented occurred before the July 17, 2007 warning.

minimum acceptable score. . . .Performance less than 100 percent will require a behavior based growth plan or corrective action plan with specific numerical targets."

In January, Jones finished the month with a score of 104.11, the first satisfactory score she had received in nine months and the  highest she had ever received at Bellsouth.  That score was also the last monthly score that reached a hundred that she received *while working on the phones*.

*2009 Team Leader Assignment*

After and as a result of her satisfactory score in January of 2009, Manager Pollard re-assigned Jones to a sales associate Team Leader position.  The Team Leader is a temporary non-management role created under the CBA that lasts for a period varying from 30 days to 12 months and permits the sales associate to perform some limited supervisory responsibilities. The criteria for selection includes seniority, meeting/exceeding performance objectives, satisfactory attendance, and the absence of other active discipline.   During the tenure as Team Leader, the sales associate remains in the position of sales associate but is relieved of individual sales objectives and answering incoming customer calls, and receives a 10% wage increase. Accordingly, during the several months when Jones held the Team Leader assignment, she did not receive performance objectives and had no issues with performance scores.

*Attendance and FMLA before Protected Conduct*

Bellsouth has an adherence policy, which governs attendance and limits the amount of time a sales associate can be away from the phones to breaks and the lunch period, and personal time is only allowed for required restroom visits.  Ginger Minor was Jones's supervisor regarding adherence.  Jones explained in her deposition that Bellsouth had no sick policy for the sales

associates, so when associates were required to be absent, they take FMLA leave.  The AT&T

FMLA Operations Unit handles the approval or denial of FMLA leave, not the sales coaches or

the sales managers.

Jones received counseling for unsatisfactory attendance and punctuality in November of

2007 and November of 2008.  During the period in 2009 when she was a Team Leader, Jones

applied for the following FMLA leave: 8.5 hours on March 9, 2009 and 8 hours on April 20,

2009.  The AT&T FMLA Processing Unit denied the claims for both 2009 FMLA requests,

because it did not timely receive documents from Jones's medical provider supporting the

requests and from Jones justifying the untimely document submissions.  Jones claims that the

denial was in error and that she did not receive numerous requests sent to her at work for the

required documents.  However, the court will not discuss this denial in detail because Jones does

not identify that denial as discriminatory or retaliatory.  The court mentions the denial only

because it resulted in attendance counseling and the attendance counseling affected Jones's

eligibility for her Team Leader position, as further discussed below.

*Loss of the Team Leader Assignment and Alleged Racist Comments*

On May 28, 2009, Pollard advised Jones that she was no longer assigned to be a Team

Leader and would return to telephone duty.  Jones claims that Pollard met with her early in the

day on May 28 to compliment her on her work but to advise her that she had lost the temporary

assignment because he had too many Team Leaders and needed more employees manning the

phones.  However, later in the day, she had another meeting with Pollard and a union

representative, and in that second meeting, she acknowledges Pollard's advising her that she was

placed back on the phones because of her unsatisfactory attendance.  Although the Team Lead

assignment was temporary and all Team Leaders remained sales associates, the assignment had

not technically been a promotion to a new permanent position.  However, because the assignment

did carry with it a pay stipend, Jones considered the re-assignment to be a demotion.  She stated

in her deposition that she *does not* believe Pollard demoted her because she is African American.

FMLA Operations – not Pollard – had handled Jones's FMLA requests, and Jones

considered the handling of those requests to be unfair, particularly when it affected her eligibility

to be a Team Leader.  When she tried to explain to Pollard that she had made inquiries with the

staff handling attendance and had been given the wrong information resulting in the FMLA

denial, Pollard told her that she needed to take personal responsibility.  The discussion became

heated with Jones telling Pollard she did not agree with what he was doing.  Pollard responded by

telling her that if she challenged him she would "not get anywhere within the company."  Jones

next advised Pollard that "I knew my rights and that I did work with the Human Rights

Committee as a part of a union elsewhere and that there were other avenues that could be taken."

(Doc. 30-1, at 72).

Pollard proceeded to say two things that Jones characterizes as racist: first, he asked her if

she would key his vehicle; and second, he said that he thought Jones was threatening him and

"would possibly have him jumped" outside.  (Doc. 30-1, at 72-73). Before these comments, Jones

had not experienced any conduct, statements, or actions that she considered to be racist.

*Protected Activity*

On May 29, 2009, Jones met with Pollard again and informed him that she considered his

comments the day before to be racist and she did not appreciate him threatening her.  He reiterated

the comments.  These two comments by Pollard, made on May 28, 2009 and reiterated the next

6

day, are the only statements that Jones identifies as racial by any person at Bellsouth, made to her or made in her presence.

Also on May 29, 2009,  Jones wrote an email to Jay Murphy, Pollard's boss, advising Murphy that Pollard had made "blatant racist remarks" regarding his worry that she would key his vehicle or have someone jump him, and that Pollard "has made my work environment very hostile," defaming her by those words, and treating her "like a mere thug who will resort to vandalism."  She also stated in the letter that the demotion was an "intentional adverse action." (Doc. 30-3, at 33).

On June 8, 2009, Jones filed her first EEOC charge, checking the box for discrimination based on race and stating the discrimination took place on May 28, 2009 and ended May 29, 2009. She recounted the "racist" comments Pollard said to her regarding his worry she would key her car or have someone jump him, and concludes: "I have been harassed and intimidated because of my race."  (Doc. 30-3, at 31).   On January 26, 2010, the EEOC  issued a Dismissal and Notice of Rights for this charge, advising her that a lawsuit must be filed in 90 days, but Jones did not file a lawsuit in 2010.

*2009 Performance after Protected Conduct*

From the time that she returned to sales associate in June 2009 until the end of that year, Jones never met her minimum performance score; she received scores of 86.30 for June, 92.92 for July, 88.39 for August, 86.6 for September, 84.98 for October, 84.98 for November and 79.90 for December.

*Alleged Harassment after Protected Conduct*

*– Harassment regarding Performance*

From June in 2009 until her termination in May of 2010, Jones reported to sales coach Alifah Furqan, who is African American.  From the time she was "demoted" from Team Leader and was placed back on the phones, Jones received what she considered to be undeserved scrutiny and monitoring.  Furqan began standing over her daily, listening to her calls with the remote headset and coaching her about what to say while she was talking to her customers.  Jones does not specify exactly the dates or the hours of  monitoring that she received from Furqan beginning in June 2009 except to say generally  that it was more than she had received previously as a sales associate.  She does not specify the amount of monitoring she received compared to what other sales associates received, except to say that they received less.   Jones recalls Furqan sending out an email to the whole team highlighting individuals whose numbers were not up to the satisfactory point that month, including Jones, and referring to Jones as a "slacker."

Jones testified that she does not believe that Furqan monitored her excessively *because of her race*; however, she *believes* that Furqan began this harassment because Pollard ordered her to do so.  Given the timing, Jones asserts that Pollard ordered the harassment in retaliation for her May accusations that he was a racist with the attendant EEOC charge and her adherence issues after the denial of FMLA time.

According to Jones, another form of harassing behavior was her sales coach's conduct of calling into her office and threatening to terminate her if she did not raise her sales numbers to the satisfactory level.  Jones claims that every employee was aware of the need to reach certain minimum levels and that the repeated reminder was harassment.

Further, Jones testified that someone at BellSouth tampered with her revenue numbers during the Fall of 2009, affecting her performance scores.  She claims she kept up with her numbers on a daily basis and the revenue numbers were steadily and quickly decreasing. Revenues can decrease if customers call and cancel orders, and Jones testified that she checked to see if such cancellations occurred but the decrease in revenues were not caused by customers calling and cancelling and taking products off.  She has no records or notes substantiating her claim that the revenue numbers were decreasing, and she has no evidence regarding who tampered with her numbers.  Because she does not know who tampered with her numbers, she cannot say that the person responsible knew of her EEOC charge.

*– Harassment regarding Attendance after Protected Conduct*

After her protected conduct, Jones also received what she considered to be harassment from Ginger Minor, a member of the attendance staff, regarding adherence, nit-picking about time Jones spent away from her desk and giving her "H" entries on company records documenting when she did not adhere to the schedule.  For example, Jones indicates that when she would spend more than a couple of minutes in the bathroom, a supervisor would come into the bathroom and call her name out.  Jones testified that Minor called her into the office and reminded her about the need to comply with the Adherence Policy about punctuality.  Jones testified that she did not know whether Bellsouth gave "H" entries to other employees who did not adhere to the schedule.; however, she considered this harassment to be retaliation.  She says  that she generally did not believe smokers got written up for failing to comply with the adherence policy.

In her deposition, Jones testified that she does not believe that she received this harassment *because of her race* but she does believe that she received it in retaliation for

9

challenging Pollard about her unfair demotion and objecting when he responded to that challenge with a threat and unfair stereotype.

Further, in August of 2009, Jones discovered that her FMLA hours were not listed correctly. She left work in August on vacation and when she returned, she noticed that the remaining FMLA hours had decreased during the vacation period even though she had used vacation time for her absence, not FMLA time. She asserts that this decrease in FMLA hours was "tampering" because no one had reason to change her FMLA time, but she has no evidence regarding who tampered with them. When she raised the error, she was able to receive some adjustments. As discussed later, however, she is not convinced that the FMLA adjustment was properly reflected in the revenue numbers and performance requirements for the year.

*August and September Complaint Letters*

On August 13, 2009, Jones emailed one of AT&T's Vice-Presidents, Deborah Peoples, to complain about "major hostility and scrutiny at work" that occurred since she challenged Pollard's unfairness in demoting her at the end of May. She also referred to the June EEOC Charge that she had filed.

On September 8, 2009, Jones sent an email to Peoples, Pollard, and others, explaining that the attendance department had made another error regarding her remaining FMLA hours and offering to "drop all charges" if Bellsouth would reinstate her in the Team Leader role, pay her the extra stipend for Team Leader retroactive to June 1, and permit her to remain in that role at least 8 months.

On September 30, 2009, Jones sent an email to everyone at Bellsouth above Pollard in the chain of command, recapping the incidents that occurred in May of 2009 that led to her removal

as Team Leader, the comments Pollard made on May 28, 2009, and the errors Jones found in her

FMLA hours in August of 2009.

2009 *Discipline after Protected Conduct*

*– Corrective Action Plan*

On September 14, 2009, Mac'Kesha Stinson, who is African American, counseled Jones

regarding her unsatisfactory job performance. Bellsouth placed her on a Corrective Action Plan of

"CAP" requiring her to gradually improve her scores, which had dropped into the 80% range

during two months in the summer.  Bellsouth waited three months from the time she returned to

the phones before placing her on CAP, but Jones asserts that she should have had more than three

months of transition time to the phones.  She cannot, however, name any sales associates – white

or African American – to whom Bellsouth gave more transition time before placing her on CAP.

Her CAP plan required the following gradual score improvement:   to 94% for September, 97%

for October, and 100% for November.  However, Jones actual scores for the months were 86.08

for September, 84.98 for October, and 84.98 for November; her scores dropped rather than

increasing, and she did not meet or exceed the CAP requirements.

On December 1, 2009, Bellsouth issued her a warning for unsatisfactory job performance

based on September, October, and November scores.  Jones acknowledges that the scores were

less than satisfactory but asserts that the numbers are low because she had used FMLA leave

during this time and that the FMLA leave should have been taken into account.  Upon looking at

the 2009 scorecard, she acknowledges that from June through December, her baseline objective

was revised to be lower because she had used some FMLA time.  Despite acknowledging the

revision, Jones still asserts that she was performing satisfactorily in light of the FMLA time off,

but she provides no supporting evidence for that assertion.

*– 2009 Attendance and Discipline for Attendance*

On October 2, 2009, Mac'Kesha Stinson again counseled Jones for adherence misconduct. Jones admits that she was not meeting adherence standards at times and indicates that her trips to the restroom are responsible for not adhering to the schedule. She provides no examples of employees -- white or African American -- who did not adhere to the schedule and who did not receive documentation in records for adherence misconduct.

*Second EEOC Charge*

On December 11, 2009, Jones filed a second EEOC Charge, checking the box for "Retaliation," and stating that discrimination took place between the dates of June 8, 2009 and December 2, 2009.  In that charge, she claims that since filing the last EEOC charge she received the following retaliation:   harassment and close monitoring from supervisors, tampering with FMLA hours and revenue figures, unwarranted discipline, and threats for discharge if her sales do not increase.  In discussing the charge in her deposition, Jones acknowledged that she was complaining of retaliation during this period but that she had not experienced any other racially inappropriate conduct.

*2010 Discipline and Termination*

Jones's 2010 scores remained significantly less than satisfactory.  Her January score was 74.21, February was 83.65, March was 87.57, and April was 80.69.  On February 16, 2010, Jones received a letter in lieu of suspension for unsatisfactory performance,  after she ended January 2010 with a score of 74.21.  Jones filed a grievance with BellSouth over the letter.

On April 7, 2010, Jones met with Pollard, Mac'Kesha Stinson, and Vicki Grace (a union

steward) to discuss the conflict.  Jones asserted that the numbers had been miscalculated because of the FMLA issue and other errors.  According to Jones, Pollard apologized for the miscalculation and promised to give Jones some time to pull her numbers back up.  Pollard left the meeting at some point, and Jones, Grace, and Stinson signed an agreement stating "Per agreement with the CWA agreed to remove Letter in Lieu for Performance on October 31, 2010 if Jones is SAT[isfactory] on her APM Scorecard" and also agreed to "remove Warning for Performance on December 31, 2010 if Twana Bond-Jones is SAT[isfactory] on her APM Scorecard." (Doc. 30-3, at 58 & 59).   As noted previously, the CWA generally provides that a warning will be removed after 24 months and a letter in lieu of suspension will be removed after 36 months if no disciplinary action happens in the interim period; this agreement shortened the period for the removal of the letter in lieu, and provided that if Jones could get her performance numbers in the satisfactory range and keep them so throughout the rest of the year, her records would be purged of the warning and letter in lieu.

Jones understood that this agreement meant that she would receive no discipline for performance scores until October of 2010, and that she was given breathing space until October to increase her numbers gradually to the satisfactory level.  Although Pollard had left the meeting at one point and did not sign the agreement, she testified that she was assured he had agreed to it. However, Pollard subsequently met with Jones that same day to clarify the agreement. He wanted to make sure Jones understood that she would still be subject to progressive discipline if she did not get her results to a satisfactory level each month in the interim period before the end of October.  When he confirmed that Jones had been "confused" about the agreement, he advised Jones that she would not receive discipline for unsatisfactory March numbers, which generally

13

came out after the end of the month, but that she would be disciplined if her April numbers were not satisfactory.

The next day, April 8, 2010, Jones wrote a letter to Pollard, Peoples, and others objecting to Pollard's revision of the agreement, complaining about the mistakes the attendance staff had made, and offering to forgive and forget the conflicts she had experienced if BellSouth would simply give her until October 31, 2010 to reach a satisfactory level.  In other words, she was asking if BellSouth would honor her understanding of the April 7 agreement.  In that letter, Jones made an interesting statement: "To be brutally honest.  Had I been given proper information from the attendance staff, who actually (per the FMLA dept.) I am to go to.  None of this would have happened.  If AT&T would have taken responsibility that yes staff can make errors (which has occurred many times since then) I believe I would not be in this predicament."

On May 6, 2010, BellSouth terminated Jones's employment for continued unsatisfactory performance.  The April score was 80.69, significantly less than satisfactory.

*Third EEOC Charge*

On May 7, 2010, Jones filed the third EEOC Charge, alleging that BellSouth terminated her in retaliation for the two previous EEOC charges.  On August 23, 2011, the EEOC issued a Dismissal and Notice of Rights for the second and third EEOC Charges, filed in December of 2009 and May of 2010.  Jones filed the instant suit on November 8, 2011, within 90 days of the August Notice of Rights letter.

## II.  STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present

and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant.  *Id*. at 248.  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

15

(1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings."  *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-moving party "is

16

to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment , the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

### III.  DISCUSSION

In her second Amended Complaint, Jones alleges that she experienced harassment and disparate treatment after her May 28, 2009 meeting with her manager and that she was "terminated from her employment based, in whole or part, upon her race and retaliation in violation of Title VII...." (Doc. 22).   Although the current Amended Complaint is not entirely clear whether she is asserting any claims except retaliation, Jones's briefs state that she is indeed asserting claims for racial discrimination and what she characterizes as "harassment" and "disparate treatment" in addition to retaliation, all occurring after May 28, 2009.  Her current Amended Complaint and briefs consistently state that she is *not* making a discrimination claim based on her May 2009 demotion, because the allegations of the pleading and her briefs indicate that, while she considered the demotion unfair, the alleged discrimination began *after* she

complained about the demotion.  Accordingly, the court does *not* address the reassignment from Team Leader in May 2009 as part of this action.

    A.  Hostile Work Environment based on race

        1.  Alleged "racial" comments on May 28-29, 2009

Jones filed her first EEOC Charge on June 8, 2009, complaining of alleged racist comments that Pollard made on May 28-29, 2009 after she challenged the fairness of her re-assignment from Team Leader back to the phones.  On January 26, 2010, the EEOC  issued a Dismissal and Notice of Rights for this charge, advising her that a lawsuit must be filed in 90 days.  However, Jones did not file a lawsuit in 2010; she filed the instant suit in November of 2011.  To be timely, a complaint alleging unlawful discrimination in violation of Title VII must be filed within 90 days of receipt of a Right to Sue letter.  *See* 42 U.S.C. § 2000e-5(f)(1).

The court does not find the comments that offended Jones to be racial in nature.  It does find that her claims of harassment and racially hostile work environment *based on those comments* are untimely and are barred.

        2.  Harassment from June 8, 2009 to termination

In her second and third EEOC Charges and deposition testimony, Jones recounts conduct occurring at her workplace that harassed and offended her.  However, in her second and third EEOC Charge, she does not check the "race" box; rather, she checked the "retaliation" box and continually relates the harassment not to her race but to retaliation for filing an EEOC charge.  Given Jones's *pro se* status and the court's obligation to be lenient with her filings, the court will nevertheless address this claim to determine whether she has established a *prima facie* case.

To establish her *prima facie* case of hostile work environment based on race, a plaintiff

must establish that "(1)[she] belongs to a protected group; (2) [she] was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability." *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1292 (11th Cir. 2012).  In its motion for summary judgment, BellSouth argues that Jones has not established element three because the alleged harassment was not based on her race, and that she has not established element four because the harassment was not severe or pervasive.  For the reasons stated below, the court agrees that Jones has not presented evidence establishing element three.

In her deposition testimony, Jones very clearly states again and again that she does not claim that the identified harassment was based on race.  Significantly, when discussing the second EEOC Charge filed in December of 2009 in which she checked the box for "retaliation" but not "race," Jones testified as follows:

> Q.  This is an EEOC charge, Charge Number: 420-2010-00621, filed by you on December 11th, 2009; correct?
> A.  Yes.
> Q.  And it is discrimination based on retaliation, correct?
> A.  Yes.
> Q.  And it is June 8, 2009, the earliest date; and 12/2/2009, the latest date; correct?
> A.  Yes.
> Q.  Okay.  So at this point, you had not experienced any other conduct that you thought was racially inappropriate; correct?
> A.  Correct.

(Doc. 30-2, at 30).

She identified excessive monitoring by her performance supervisor, Furqan, who is

African American, as one type of harassment.  In addition to the monitoring, Furqan called Jones

into her office to remind Jones that she was not performing satisfactorily, and Jones felt that this

action also constituted harassment.  Jones also cited as another harassing act from Furqan a rude

email sent to sales associates calling Jones a "slacker," and highlighting those, including Jones,

who were not performing satisfactorily. When asked whether she felt Furqan was harassing and

monitoring her excessively *because of her race*, Jones responded simply "No."  (Doc. 30-1, at

103).  Because Jones also testified that she believed Pollard was responsible for ordering the

excessive monitoring, she was asked whether Pollard ordered the monitoring *because of her*

*race*, and Jones again answered definitely "No."  (Doc. 30-1, at 106).

Another type of harassment Jones identified was Ginger Minor's "nit-picking" with

adherence issues such as too much time spent in the bathroom, and calling Jones into her office

to remind her that she was not complying with adherence issues. Once again, when asked

whether this adherence harassment was *because of her race*, Jones answered, "No."  (Doc. 30-1,

at 113).

Another type of harassment she claims to have experienced involved someone

"tampering" with her hours of family leave.  As noted in the facts, Jones had experienced

problems and what she considered to be errors with her FMLA hours *before* May of 2008, and

she does not complain that those previous errors were racial in nature.  She provides no *evidence*

supporting an inference that the alleged FMLA errors *after* May of 2008 were a result of

intentional conduct that was racial in nature.  Jones acknowledges that she does not know who

tampered with her hours, but the evidence reflects that the persons who were responsible for the

excess monitoring – Furqan and Pollard – have nothing to do with input of FMLA hours; the

AT&T FMLA Operations Unit handles FMLA hours.  Further, as Jones also acknowledges, the evidence reflects that the FMLA hours were revised at some point, and Jones presents no evidence that the FMLA hours were incorrect after the revision. In sum, no *evidence* supports Jones's allegations that the problems with FMLA hours had some racial tie.

Jones also asserts that someone allegedly "tampered" with her revenue numbers.  She has no evidence to support that assertion other than her vague testimony that she was keeping track of her numbers, noticed the revenue numbers decreasing, and performed a check that confirmed that the decrease was not justified.  If she were keeping track of such numbers and noticed discrepancies, logic suggests that she would copy the records to document the discrepancy or at least take notes showing the numbers decreasing without explanation.  She provides no documentation whatsoever.   While her testimony itself is evidence of dropping revenue numbers, Jones provides no *evidence* that the dropping numbers represent  intentional tampering as opposed to computer or human error.  Further, she provides no *evidence* tying the dropping revenue numbers to race or even providing a reasonable inference that race was somehow implicated.

As is clear from this review, Jones has not presented evidence that the harassment was race-based.  In fact, her own deposition testimony specifically and unequivocally states that most of the harassment was *not* race based, and the remainder of the harassment is not tied to race by any evidentiary thread.   The court notes that Jones argues in her briefs that the harassment is race-based, but her unsupported arguments do not represent evidence and cannot contradict her clear deposition testimony.  Because the claim based on the May 2009 comments are barred and because Jones has not established element three of her *prima facie* case regarding harassment

that began in June of 2009, the court need not address the absence of evidence that the alleged

harassment was severe or pervasive.  The motion for summary judgment is due to be GRANTED

as to the claim for racially based hostile work environment.

B. Disparate Treatment based on Race

As discussed previously, when Jones filed the second and third EEOC Charges upon

which this suit is based, she did not check the "race" discrimination box.  Because Jones

mentions disparate treatment in her briefs, the court simply states, in an abundance of caution,

that Jones has identified no white comparators, and, thus, cannot establish a *prima facie* case on a

disparate treatment theory.  *See Holifield v. Reno*, 114 F.3d 1555, 1562 (11th Cir. 1997)

(explaining that "[a]s part of the Title VII plaintiff's prima facie case, the plaintiff must show that

the employer treated similarly situated employees outside [her race] more favorably than

herself."). To the extent, if any, that Jones presents a claim for disparate treatment based on race,

she cannot establish her *prima facie* case, and the motion for summary judgment is due to be

GRANTED.

C.  Retaliation

Jones's final claim is for retaliation.  To establish her *prima facie* case based on this

claim, she must show that "(1) she engaged in statutorily protected expression; (2) she suffered

an adverse employment action; and (3) the adverse action was causally related to the protected

expression."  *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311-12 (11th Cir. 2002).  If she

meets her *prima facie* case, under the *McDonnell Douglas* framework, the burden shifts to

BellSouth to "articulate some legitimate, non-discriminatory reason for the employee's [adverse

treatment]."  *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 526 (1993).  If BellSouth so

articulates, Jones next has the burden to prove that the legitimate reasons offered by the defendant "were not its true reasons but were a pretext for discrimination." *See id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981)).

In the instant case, BellSouth argues that Jones has not established any of the three elements of her *prima facie* case. The court notes that BellSouth's challenge to element two is not well taken, and the failure to concede that particular element wastes the court's time and is not effective advocacy; in what alternate universe does termination of employment not represent an adverse employment action?

BellSouth also argues that Jones has failed to show protected conduct and causation. The court further notes that Jones has filed three EEOC Charges, two of which were filed before termination, and thus, her activity falls within the "participation clause," which protects an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 20003-3(a). The court need not address BellSouth's other arguments on the *prima facie* case. Even assuming *arguendo* – without deciding – that Jones meets her *prima facie* case, summary judgment is appropriate because BellSouth has articulated legitimate, nonretaliatory reasons for its employment decisions, and because Jones has so clearly failed to show pretext as a matter of law, as further discussed below.

### *BellSouth's Legitimate, Non-Retaliatory Reason*

To meet its burden of articulation, BellSouth need only present a legitimate, nonretaliatory reason for its termination of Jones, one that would "motivate a reasonable employer" to terminate her. *See Alvarez v. Royal Atlantic Developers, Inc.,* 610 F.3d 1253, 1266

(11th Cir. 2010).    The court finds that BellSouth has indeed articulated a legitimate

nonretaliatory reason:  Jones's unsatisfactory performance as measured by unacceptable

performance scores for most of her tenure at BellSouth.

Thus, Jones has the burden of proving BellSouth's proffered reason was not its true

reason.  To show pretext, she must demonstrate "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for

its action that a reasonable factfinder could find them unworthy of credence. . . .Provided that the

proffered reason is one that might motivate a reasonable employer, an employee must meet that

reason head on and rebut it. . . ."  *Id.* at 1265-66.

Jones does not meet BellSouth's reason head-on and rebut it with evidence that her

performance was satisfactory.  Rather, the record is replete with evidence that Jones's

performance was *un*satisfactory.  Indeed, the evidence reflects that out of the *four years* Jones

was employed with BellSouth, she only met performance goals *when working on the phones* for

*five months*: the first three months she was employed in 2007, April of 2008, and January of

2009.  Further, this performance problem began well *before* her protected conduct; her

performance had failed to meet the required levels for nine months in 2007 and eleven months in

2008.  The evidence also reflects that she received discipline for those pre-protected conduct

performance issues:  counseling entries on May 3, 2007; June 11, 2007; a warning on July 17,

2007; and a discussion with coach Tangela Morton in February 2009 about her poor 2008

performance scores.

The evidence reflects that her poor performance in 2009 and 2010 was merely a

continuation of that pattern when, after returning to the phones, she never reached satisfactory

performance scores.  In light of that rather dismal performance history, the conduct that Jones

considers to be harassment – monitoring, supervision, establishment of a corrective action plan,

calling Jones into offices to remind her of goals and requirements – could instead reasonably be

viewed as a conduct of good business attempting to ensure that its struggling employee received

not only mentoring and tools to assist her but also notice that her current performance was not

acceptable so that she would have a last chance to improve.

Jones's only attempt to rebut BellSouth's articulated reason for her termination and the

wealth of evidence of unsatisfactory performance scores is to assert that the revenue numbers

were incorrect.  To that end, she provides merely her own testimony that the revenue numbers

were higher and then dropped mysteriously.  While this testimony is evidence of a revenue drop,

albeit uncorroborated with any kind of documentation, Jones provides no evidence linking the

drop to retaliation.  She has no evidence that the drop was human rather than computer error.

She has no evidence tying the drop to employees who knew of the EEOC charge.  Further, she

has no evidence about the exact *amount* of the drop to gauge whether her performance scores

would have been satisfactory without the drop. In short, she has no evidence creating a

reasonable inference that the drop occurred as a result of a retaliatory act.  Rather, the evidence

reflects that Jones's post-protected  unsatisfactory performance was simply a continuation of the

pre-protected unsatisfactory performance.

The court finds that Jones has not presented evidence of pretext.  Accordingly, the motion

is due to be GRANTED as to the retaliation claim.

Having found that BellSouth's motion for summary judgment is due to be GRANTED as

to all claims against it, the court WILL ENTER SUMMARY JUDGMENT in its favor and

against the Plaintiff, Ms. Jones.  The court will enter a separate Order simultaneous with this

Memorandum Opinion.

 Dated this 19th day of August, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE